## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 22-20640-CIV-BLOOM/OTAZO-REYES

TANISA TAMITO EVERETT,

      Plaintiff,

v.

KILOLO KIJAKAZI,
Acting Commissioner of Social Security,

      Defendant.

_____/

### REPORT AND RECOMMENDATION

      THIS CAUSE is before the Court upon Plaintiff Tanisa Tamito Everett's ("Claimant")
Motion for Summary Judgment and Supporting Memorandum of Law (hereafter, "Claimant's
Motion for Summary Judgment") [D.E. 13] and Defendant Kilolo Kijakazi, Acting Commissioner
of Social Security's ("Commissioner"), Motion for Summary Judgment with Supporting
Memorandum of Law and Opposition to Plaintiff's Motion for Summary Judgment (hereafter,
"Commissioner's Motion for Summary Judgment") [D.E. 20].   The administrative transcript
(hereafter, "TR.") has been filed [D.E. 11].[1]   For the reasons stated below, the undersigned
respectfully recommends that Claimant's Motion for Summary Judgment be DENIED, the
Commissioner's Motion for Summary Judgment be GRANTED, and the Commissioner's decision
be AFFIRMED.

### PROCEDURAL HISTORY

      Claimant filed an application for supplemental security income ("SSI") and an application
for disability insurance benefits ("DIB") on May 6, 2020, alleging a disability onset date of

---

[1] The references hereafter (TR. __) are to the transcript pages rather than the court record pages.

December 13, 2019.  TR. 107.  The applications were denied initially and upon reconsideration. Id.  Upon Claimant's written request, a hearing was held on October 26, 2021, before Administrative Law Judge Clara H. Aranda ("ALJ Aranda"), at which Claimant and Vocational Expert James F. Conway ("VE Conway") testified.  Id. at 130–73.

On November 10, 2021, ALJ Aranda issued an Unfavorable Decision, finding the following:

(1) Claimant met the insured status requirements of the Social Security Act through December 31, 2024.  Id. at 109.

(2) Claimant had not engaged in substantial gainful activity since December 13, 2019, the alleged onset date (20 C.F.R. §§ 404.1571 et seq. and 416.971 et seq.). Id.

(3) Claimant had the following severe impairments: osteoarthritis of bilateral hips, inflammatory polyarthropathy, degenerative joint disease of bilateral shoulders, degenerative disc disease of the spine, and obesity (20 C.F.R. §§ 404.1520(c) and 416.920(c)).  Id. at 110.

(4) Claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).  Id.[2]

(5) Claimant had the residual functional capacity (hereafter, "RFC") to perform sedentary work with certain limitations.  Id. at 111.[3]

(6) Claimant was unable to perform any past relevant work (20 C.F.R. §§ 404.1565 and 416.965).  Id. at 115.[4]

---

[2] The Social Security Administration's ("SSA") Listing of Impairments "describes for each of the major body systems impairments that [the SSA] consider[s] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience."  20 C.F.R. §§ 404.1525(a) and 416.925(a).

[3] The RFC is the ability of a claimant to do physical and mental work activities on a sustained basis, despite the claimant's limitations or impairments.  See 20 C.F.R. § 416.945(a)(1).  The RFC must be determined based on all of the claimant's impairments, even those that are not considered "severe."  See 20 C.F.R. §§ 416.920 and 416.945.

[4] "Past relevant work is work that you have done within the past 15 years, that was substantial gainful activity, and that lasted long enough for you to learn to do it."  20 C.F.R. §§ 404.1560(b)(1) and 416.960(b)(1).

(7)  Claimant was born on May 20, 1973 and was 46 years old, which is defined as a younger individual age 45–49, on the alleged disability onset date (20 C.F.R. §§ 404.1563 and 416.963).  Id. at 116.

(8)  Claimant had at least a high school education (20 C.F.R. §§ 404.1564 and 416.964).  Id.

(9)  Transferability of job skills was not material to the determination of disability because using the Medical-Vocational Rules as a framework supported a finding that Claimant was "not disabled," whether or not Claimant had transferable job skills (SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).  Id.

(10)  Considering Claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that Claimant could perform (20 C.F.R. §§ 404.1569, 404.1569a, 416.969, and 416.969a).  Id.

(11)  Claimant had not been under a disability, as defined in the Social Security Act, from December 13, 2019, through the date of the decision (20 C.F.R. §§ 404.1520(g) and 416.920(g)).  Id. at 117.

On February 1, 2022, the Appeals Council denied a request for review of ALJ Aranda's Unfavorable Decision.  Id. at 1–7.  On March 2, 2022, pursuant to 42 U.S.C. § 405(g), Claimant filed this action seeking reversal of ALJ Aranda's final administrative decision [D.E. 1].

In support of her contention that ALJ Aranda's Unfavorable Decision should be reversed, Claimant argues that:

I.    The Appeals Council abused its discretion in declining to admit "new and material" evidence showing Claimant underwent a total right hip replacement just 34 days after the ALJ's decision was issued; and

II.   The ALJ failed to properly assess the opinion evidence of record and, consequently, the ALJ's RFC finding was also not supported by substantial evidence.

See Claimant's Motion for Summary Judgment [D.E. 13].  The undersigned finds no merit in either of these contentions.

## RELEVANT MEDICAL EVIDENCE

### A. Treating Sources

### 1) Orthopaedic Associates, USA

On April 24, 2019, Claimant presented to Orthopaedic Associates, USA for an evaluation of her bilateral hip pain and was seen by Mark Bridges, M.D. ("Dr. Bridges"). TR. at 529, 553.[5] Claimant explained that she had sustained an injury to her hips the year before when she fell out of a chair and rated her pain at 7 out of 10. Id. She stated that she took pain medication, which provided some relief, but that she experienced pain in the groin area of both hips when she attempted to ambulate. Id. Claimant also relayed that she had recently started to experience left shoulder pain. Id. She described this pain as originating over the anterior and lateral aspect of the shoulder, especially with overhead and behind-the-back movements, and that the pain radiated to her arm. Id. Claimant stated that she experienced this shoulder pain particularly at night. Id. She denied numbness, back pain, fever, chills, neck pain, and elbow pain and stated that she did not require any therapy, injections, or operative interventions for her hips or left shoulder. Id.

Dr. Bridges noted that Claimant had a prior history of bilateral hip heterotopic ossification after a prolonged period of immobilization while intubated. Id. He also noted that Claimant suffered from arthritis, low back pain, and hypertension. Id. Claimant did not have allergies, consume alcohol, or smoke. Id. She had a past surgical history of a right knee arthroscopy; and a family history of arthritis, diabetes mellitus, cancer, gout, heart disease, and hypertensive disorder. Id. A review of systems indicated that Claimant had joint pain, joint stiffness, and joint swelling. Id. Claimant was 5'3" tall and weighed 220 pounds. Id.

A physical examination revealed that Claimant was well developed, well nourished, and in

---

[5] ALJ Aranda noted that Dr. Bridges' records were "[p]re-onset records"; nevertheless, she discussed these records in her decision. TR. at 112.

no apparent distress.  Id. at 530, 554.  Claimant was alert, oriented, and cooperative; and she had full range of motion in her neck, with no tenderness to palpation or muscle spasms present.  Id. An inspection of her left shoulder revealed that it was tender to palpation at the greater tuberosity and subacromial space and at the anterior joint line; nevertheless, Claimant retained full strength in the area.  Id.  An inspection of her hips revealed that their overall alignment was normal; they were not swollen or deformed; and they had full range of motion with no pain upon internal and external rotation.  Id.  Moreover, Claimant had full function of the knees and ankles; however, her gait was antalgic.  Id.

An X-ray of Claimant's left shoulder confirmed that she had rotator cuff tendonitis.  Id. Dr. Bridges noted that Claimant was awaiting magnetic resonance imaging ("MRI") of her left shoulder and that she would benefit from an injection if her pain persisted.  Id.  Moreover, an X-ray of Claimant's hips confirmed that she had early osteoarthritis.  Id.  Dr. Bridges indicated that Claimant would work on gluteal strengthening and weight loss and occasionally take an anti-inflammatory medication to help with her pain.  Id.

On May 2, 2019, Claimant presented for a diagnostic follow up of her bilateral hip pain with Dr. Bridges.  Id. at 527, 550.  She rated her pain at 6 out of 10 and stated that she experienced some relief when she took pain medication.  Id.  Claimant explained that she experienced pain when she attempted to ambulate and that it intensified with any movement.  Id.  Claimant confirmed that she did not ambulate with an assistive device.  Id.  Additionally, Claimant rated her left shoulder pain at 8 out of 10 and stated that it intensified with arm raises and behind-the-back movements.  Id.  An MRI revealed that Claimant had subcutaneous fluid collection in her right hip and partial articular surface tearing in the supraspinatus tendon in her left shoulder.  Id. at 527, 533–42, 558–67.  However, both regions displayed normal joint space.  Id. at 527, 550.  Dr.

Bridges administered a steroid injection to Claimant's left shoulder.  Id. at 528, 551.

On June 26, 2019, Claimant presented for a follow up evaluation of her right hip pain with Dr. Bridges.  Id. at 525, 548.  Claimant indicated that her pain and instability sensation had improved since her prior visit and rated her pain at 7 out of 10.  Id.  However, she stated that her left shoulder pain was unchanged since her prior visit, and that she had only experienced two weeks of relief from the injection.  Id.  Claimant also indicated that she occasionally wore a sling for support.  Id.  Dr. Bridges noted that Claimant would attend physical therapy and that, if her pain persisted, she would benefit from an arthroscopic partial rotator cuff repair.  Id. at 526, 549. Dr. Bridges also noted that Claimant's right hip pain had improved significantly.  Id.

On August 7, 2019, Claimant presented for a follow up evaluation of her left shoulder pain with Dr. Bridges.  Id. at 523, 546.  She rated her pain at 9 out of 10 and stated that her pain was unchanged since she had received the injection in May.  Id.  Claimant also stated that she was experiencing minimal improvement from physical therapy, and that her pain intensified after therapy or any movement of the shoulder.  Id.  However, Claimant had received a new injection the week prior, which had provided some relief alongside her pain medication.  Id.  She also complained about neck pain, secondary to a possible disc herniation.  Id. at 524, 547.  Dr. Bridges indicated that she would benefit from an MRI and suggested to Claimant that she avoid strenuous activity until the MRI was completed.  Id.

On September 5, 2019, Claimant presented for a follow up evaluation with Dr. Bridges. Id. at 521, 544.  An MRI of Claimant's cervical spine had revealed that she had disc bulges and straightening of the normal lordosis, but no fracture or dislocation, osseous or soft tissue lesions, or osteophytes.  Id. at 521, 531–32, 544, 556–57.  Dr. Bridges indicated that he would refer her to the pain management department to discuss a possible epidural injection.  Id. at 522, 545.

### 2)  Path Medical-North Miami

On March 9, 2020, Claimant presented to Path Medical-North Miami for an evaluation of injuries that she had sustained in a slip and fall accident on February 22, 2020, and was seen by Mark Richards, D.C. ("Dr. Richards").  Id. at 655.  Claimant relayed that, although she had not lost consciousness from the fall, she went to Memorial South Hospital two days after the accident to undergo X-rays and a computerized tomography ("CT") scan.  Id.[6]  She reported the following symptoms to Dr. Richards: constant neck pain radiating into her left shoulder; constant and sharp left shoulder pain; constant and sharp left knee pain; constant and sharp low back pain radiating into her left hip; and difficulty bending, sleeping, moving her arms and legs, and holding her cell phone.  Id.  Claimant stated that she had been pain free until the accident and reported having high blood pressure.  Id.

A physical examination revealed that Claimant's gait was normal; and a postural examination revealed that her left shoulder and right hip were high.  Id. at 657.  Moreover, a neurologic examination revealed that her cardinal fields of gaze were within normal limits; her deep tendon reflexes were 2+ and symmetrical at the biceps, triceps, brachioradialis, patella, and Achilles; her motor power was 5+ over 5+ in the upper and lower extremities bilaterally, except her left leg extension and left shoulder flexion were both 3/5; her sensory testing of the upper and lower extremities was within normal limits bilaterally; and her pupils were equal and reactive to accommodation.  Id.  A musculoskeletal examination revealed that Claimant had moderate spasm and tenderness in her cervical spine and lumbar spine, and that all cervical and lumbar ranges of

---

[6] At the hospital, a physical examination revealed that Claimant was well developed and not in acute distress; her heart rate and heart sounds were normal and regular; she was not in respiratory distress; she had a normal range of motion; she was alert and oriented to person, place, and time; she did not have any sensory deficit or abnormal muscle tone; her coordination was normal; and her left shoulder was tender. Id. at 734.

motion were positive for pain and moderate restrictions.  Id.  The examination further indicated that Claimant had pain on the anterior deltoid in her left shoulder and decreased range of motion in all of its planes, as well as pain on the lateral aspect of her left knee with decreased range of motion on flexion and extension.  Id.  Claimant was referred for an MRI of her cervical spine, which revealed several disc bulges and a reversal of the normal cervical lordotic curvature.  Id. at 666.  Claimant also underwent an MRI of her lumbar spine, which also revealed several disc bulges and bilateral facet arthropathy.  Id. at 668.  Finally, Claimant underwent an MRI of her left shoulder, which revealed a partial articular surface tear of the supraspinatus tendon with associated interstitial partial tearing and tendinopathy; subacromial/subdeltoid bursitis; small glenohumeral joint effusion; an ill-defined lesion in the proximal humerus; and degenerative changes in the acromioclavicular ("AC") joint.  Id. at 670.

### 3) Advanced Orthopedics & Spine Surgery

On April 8, 2020, Claimant presented to Advanced Orthopedics & Spine Surgery for a consultation regarding her slip and fall injuries and was seen by Barry E. Schapiro, M.D. ("Dr. Schapiro").  Id. at 704.  Claimant rated the pain in her left shoulder at 6 on the visual analog scale ("VAS").  Id.  She relayed to Dr. Schapiro that she had been undergoing physical therapy with some improvement in her pain, but that she was experiencing persistent and constant pain in her left shoulder that was exacerbated by overhead lifting.  Id.  Claimant explained that she sometimes struggled to sleep on her shoulder due to the pain; she also felt pain in her neck, back, and left knee; and she had a preexisting injury to her right shoulder that had improved.  Id.  Claimant also indicated that the steroid injection administered by Dr. Bridges had provided her with two to three weeks of relief, but that her left shoulder pain had been aggravated by her recent slip and fall accident.  Id.

A physical examination revealed tenderness, spasms, and limited motion secondary to pain in Claimant's cervical and lumbar spines.  Id. at 705.  The examination further revealed that Claimant's left shoulder had mild weakness with supraspinatus strength testing resistance at 4+/5 and infraspinatus strength testing resistance at 5/5.  Id.  Nevertheless, Claimant was intact neurologically.  Id.

Based on the results of Claimant's MRI from the prior month, Dr. Schapiro recommended a triple-phase bone scan to better evaluate the lesion detected in Claimant's proximal humerus.  Id. at 706.  Dr. Schapiro also indicated that Claimant would continue with physical therapy and return for a follow up appointment in four weeks, at which time, she would be eligible for a subacromial shoulder injection depending on her pain level.  Id.  Dr. Schapiro also referred Claimant to other doctors for her neck and back complaints.  Id.

On August 17, 2020, due to the persistence of her pain symptoms, Dr. Schapiro operated on Claimant's left rotator cuff, which entailed inserting a rotator cuff implant into the affected region.  Id. at 977.  On October 20, 2020, at a follow up evaluation of Claimant's left shoulder, she reported that she was having difficulty finding a physical therapy location to accept her.  Id. at 990.  Further, Claimant stated that she still felt pain in her left shoulder, especially at nighttime, as well as neck and back pain.  Id.  A physical examination revealed that Claimant's surgical wounds were well healed; her range of motion was limited to only 80 degrees of abduction and 90 degrees of forward elevation; she could reach 160 degrees in both planes with significant pain; and she had full range of motion in her wrist and elbow and was intact neurologically.  Id.  Dr. Schapiro recommended that Claimant follow up with a spine clinic and noted that Claimant would commence range of motion exercises on her own and pursue physical therapy.  Id. at 990–91.

On November 17, 2020, Claimant presented for a follow up evaluation with Dr. Schapiro.

Id. at 1055.  Claimant complained of bilateral low back pain symptoms and sacroiliac pain that was worse in the left sacroiliac joint.  Id.  She denied radiating pain or distal weakness, bowel or bladder complaints, or saddle anesthesia.  Id.  A physical examination revealed diffuse tenderness of the lumbar spine with severe tenderness over the bilateral sacroiliac joints; a normal distal neurologic examination; and a moderately restricted range of motion.  Id.  After interpreting a recent MRI of Claimant's left hip, Dr. Schapiro indicated that Claimant had significant bilateral sacroiliitis and was an excellent candidate for bilateral sacroiliac injections.  Id. at 1056.  Dr. Schapiro indicated that Claimant would receive these injections in an outpatient surgical facility in the upcoming weeks.  Id.

On March 9, 2021, Claimant presented for a follow up evaluation of her left shoulder with Dr. Schapiro.  Id. at 1170.  Claimant stated that she had completed physical therapy but that she had persistent pain in her left shoulder with overhead activities and difficulty sleeping on the shoulder.  Id.  Claimant also stated that she had pain in her left knee and in the bilateral sacroiliac joint region.  Id.  She reported that she had "chickened out" from receiving the sacroiliac joint injections.  Id.  She also stated that she took pain medications to manage her symptoms.  Id.  Dr. Schapiro noted that Claimant's range of motion in her shoulder was only to 160 degrees of forward elevation and abduction; she had decreased rotator cuff strength against resistance at 4/5 with supraspinatus; and she was intact neurologically.  Id.  Claimant expressed her desire to defer any injections in her sacroiliac joints and knee.  Id. at 1171.  Dr. Schapiro referred Claimant for an MRI arthrogram of her left shoulder to evaluate the rotator cuff repair.  Id.

On April 20, 2021, Claimant presented for a follow up evaluation with Dr. Schapiro.  Id. at 1174.  Claimant had received an intra-articular steroid injection in her left knee a few weeks prior that she claimed had helped her significantly for about two weeks; however, she reported

persistent pain in her left shoulder and knee.  Id.  A physical examination of Claimant's left shoulder revealed that she had forward elevation to 160 degrees and abduction to 160 degrees with mildly positive impingement signs; persistent weakness of the supraspinatus and 4/5 strength against resistance; and normal and intact axillary, median, radial, and ulnar nerve functions.  Id.  A physical examination of Claimant's left knee revealed no effusion, a range of motion from 0 to 125 degrees, no gross ligamentous instability, and tenderness throughout the knee, although to a lesser degree than before; and a normal neurologic examination.  Id.

A review of Claimant's MRI arthrogram showed rotator cuff tendinosis with some articular-sided, low-grade fraying; some mild bicep tendonitis and subdeltoid bursitis; some AC joint degenerative changes with type 1 to 2 acromion and labral blunting; no evidence of a recurrent tear in the rotator cuff; and the implant located in its appropriate position.  Id.  Dr. Schapiro did not recommend further intervention for Claimant's rotator cuff and encouraged Claimant to continue with home strengthening exercises.  Id. at 1175.  Claimant deferred receiving injections in her back and stated her intention to follow up with the spine department regarding her neck pain.  Id.

On April 29, 2021, Claimant presented for an appointment and was seen by Scott S. Katzman, M.D. ("Dr. Katzman").  Id. 1176.  Dr. Katzman noted that Claimant had not done any home exercises, taken anti-inflammatory medication, or received the recommended sacroiliac joint injections.  Id.  He recommended that Claimant begin home exercises, trial the anti-inflammatory medication, and purchase a cervical traction device.  Id.  Claimant was unwilling to move forward with any procedures or interventions.  Id.  Dr. Katzman indicated that Claimant had no gross motor or sensory deficit and that her cervical spine pain was stabilized.  Id.  He encouraged Claimant to do her exercises, including a home maintenance exercise program, and to visit a chiropractor.  Id.

#### 4)  Mark Jaffe, M.D. ("Dr. Jaffe")

On March 8, 2021, Claimant presented for an initial appointment with Dr. Jaffe to evaluate a possible autoimmune mediated inflammatory disorder as a result of a positive antinuclear antibody ("ANA") result.  Id. at 1165.  Claimant exhibited significant generalized osteoarthritis of the hips and complained of knee joint pain and lower back pain.  Id.  Dr. Jaffe noted that Claimant's osteoarthritis was more pronounced in her right hip and that a local orthopedic surgeon had recently stated that Claimant would likely eventually require a hip arthroplasty.  Id.  However, Claimant was fully ambulatory.  Id.  Dr. Jaffe also noted that Claimant had recently suffered from COVID-19 but did not have any lingering symptoms; and was obese.  Id.

A physical examination revealed that Claimant's gait and stance were normal; she was well appearing, well developed, well nourished, and oriented as to time, place, and person; and she did not have muscle weakness.  Id. at 1168.  However, Claimant had reduced range of motion in her left shoulder; compromised range of motion in her hips and pain in her hips that was elicited by motion; abnormal knees; and tenderness on palpation at the joint lines of both knees.  Id.  Claimant was encouraged to exercise and lose weight.  Id.  Dr. Jaffe declined to recommend any further rheumatologic investigation or intervention.  Id. at 1169.

#### 5)  Associates MD Medical Group

On December 3, 2020, Claimant presented for a new patient evaluation at Associates MD Medical Group and was seen by Deborah J. Kulper-Tomas, PA-C ("Ms. Kulper-Tomas").  Id. at 1207.  Claimant reported that she had extra bone growth from being in a coma for a month and that she needed an orthopedist to address her bone issues.  Id.  She further stated that she had a lot of joint pain, for which she was taking medication.  Id.  Ms. Kulper-Tomas noted that Claimant had a very elevated cholesterol level and weighed 236 pounds.  Id. at 1208.  A physical

examination revealed that Claimant had full range of motion and 5/5 bilateral strength; no spine tenderness and a normal range of motion in her spine; and a normal gait.  Id.  Ms. Kulper-Tomas recommended a low-fat diet and an exercise and weight loss plan; prescribed medication and referred Claimant to a cardiologist to address her hyperlipidemia; referred Claimant for several laboratory assessments to address her peripheral vascular disease; and referred Claimant for a rheumatology evaluation and orthopedic surgery to address her joint pain and bone disorder.  Id. at 1209.

On May 12, 2021, Claimant presented for a follow up appointment to address shortness of breath upon exertion after her recent COVID-19 infection.  Id. at 1276.  She was seen by Vitia Pack, PA-C ("Ms. Pack").  Claimant's body mass index ("BMI") was 39.32; she was oriented as to time, person, and place; her respiratory pattern was non-labored, and her breath sounds were clear; she did not have any spine tenderness and had normal range of motion in her spine; her sacroiliac joints were non-tender; and her straight leg raising was normal.  Id.  Ms. Pack prescribed an inhaler to address Claimant's shortness of breath and referred Claimant for several laboratory assessments.  Id. at 1276–78.

### 6)  Spine and Wellness Centers of America

On August 17, 2021, Claimant presented for an appointment at Spine and Wellness Centers of America for an initial consultation regarding her generalized body aches.  Id. at 1283.  She rated her pain at 5 out of 10 and described her neck pain as constant, achy, tight, and stiff.  Id.  Claimant also suffered from muscle spasms and stated that her neck pain worsened with prolonged sitting, lifting, and when she held items like her cell phone.  Id.  Claimant stated that she tried to relieve her neck pain by resting, limiting her activity, and taking pain medication.  Id.  Claimant further suffered from bilateral shoulder pain that she described as constant, dull, aching, sharp, and stiff.

Id.  She confirmed that she took pain medication and hot showers to help with her shoulder pain; denied numbness and tingling radiating down her arms; and admitted to bilateral upper extremity weakness and muscle spasms.  Id.  Claimant also described localized low back pain that was worse on her right side but that changed based on her activities.  Id.  Claimant described her low back pain as constant, sharp, and tight and worsened with standing, walking, lifting, and bending.  Id.  She stated that she laid down and took pain medication to help with her low back pain.  Id.  Finally, Claimant described right hip pain that she developed after overcompensating with her right hip while experiencing severe left hip pain.  Id.  She described this pain as constant, tight, and sharp and worsened with standing, walking, lifting, and bending.  Id.  Claimant sought relief by taking pain medication and limiting her activity.  Id. at 1283–84.  Claimant explained that physical therapy and steroid injections had only provided her with short-lasting relief.  Id. at 1284.  An examination revealed that Claimant did not have any impairments, but did have cervical and lumbar paraspinal tenderness to palpation and decreased range of motion in her left shoulder.  Id.  Claimant was encouraged to address her BMI, nutrition, and physical activity.  Id.

On August 27, 2021 and September 14, 2021, Claimant presented for follow up appointments at Spine and Wellness Centers of America to discuss the results of a functional assessment.  Id. at 1345, 1348.  Claimant rated her pain at 6 out of 10 and explained that the pain in her left hip had been aggravated and was worse than the pain in her right hip.  Id.  Claimant also mentioned that her doctor had recommended a double hip replacement, and that she planned on having hip surgery.  Id. at 1346–47, 1349.  It was noted that the results of Claimant's functional assessment showed loss of function consistent with her condition.  Id. at 1347.

### 7)  Premier Total Healthcare

On August 10, 13, and 20, 2021, Claimant presented for physical therapy sessions at

Premier Total Healthcare. <u>Id.</u> at 1305–07. Claimant reported that her overall pain in her neck, low back, left knee, and left shoulder had improved since commencing physical therapy; and rated her neck pain at 5 out of 10. <u>Id.</u> at 1305–06. On her last visit, Claimant reported that her pain had improved but that her symptoms persisted. <u>Id.</u> at 1307.

### 8) Functional Evaluation Testing of FL

On August 17, 2021, Claimant presented for a musculoskeletal functional assessment and was evaluated by Francisco A. Rivas, M.D. ("Dr. Rivas"). <u>Id.</u> at 1313. Claimant complained of cervicalgia and low back pain and stated that her symptoms had commenced the year before. <u>Id.</u>

Claimant answered a pain disability questionnaire as follows: on a scale of 0 (work normally) to 10 (unable to work at all), Claimant responded that her pain interfered with her normal work inside and outside the home at level 8; on a scale of 0 (take care of myself completely) to 10 (need help with all my personal care), Claimant responded that her pain interfered with personal care such as washing and dressing at level 7; on a scale of 0 (travel anywhere I like) to 10 (only travel to see doctors), Claimant responded that her pain interfered with her traveling at level 5; on a scale of 0 (no problems) to 10 (cannot sit/stand at all), Claimant responded that her pain affected her ability to sit or stand at level 8; on a scale of 0 (no problems) to 10 (cannot do at all), Claimant responded that her pain affected her ability to lift overhead, grasp objects, or reach for things at level 8; on a scale of 0 (no problems) to 10 (cannot do at all), Claimant responded that her pain affected her ability to lift objects off the floor, bend, stoop, or squat at level 9; on a scale of 0 (no problems) to 10 (cannot walk/run at all), Claimant responded that her pain affected her ability to walk or run at level 8; on a scale of 0 (no decline) to 10 (lost all income), Claimant responded that her income had declined since her pain began at level 9; on a scale of 0 (no medication needed) to 10 (on pain medication throughout the day), Claimant responded that she had to take pain

medication every day to control her pain at level 7; on a scale of 0 (never see doctors) to 10 (see doctors weekly), Claimant responded that her pain forced her to see doctors much more often than before her pain began at level 6; on a scale of 0 (no problem) to 10 (never see them), Claimant responded that her pain interfered with her ability to see the people who were important to her as much as she would like at level 8; on a scale of 0 (no interference) to 10 (total interference), Claimant responded that her pain interfered with recreational activities and hobbies that were important to her at level 9; on a scale of 0 (never need help) to 10 (need help all the time), Claimant responded that she needed the help of her family and friends to complete everyday tasks (including both work outside the home and housework) because of her pain at level 7; on a scale of 0 (no depression/tension) to 10 (severe depression/tension), Claimant responded that she felt more depressed, tense, or anxious than before her pain began at level 7; and on a scale of 0 (no problems) to 10 (severe problems), Claimant responded that emotional problems caused by her pain interfered with her family, social, and/or work activities at level 7.  Id. at 1314.  Claimant's combined score on this questionnaire was indicative of a severe disability.  Id.

Claimant also completed a functional evaluation.  Id. at 1315–16.  She described shooting pain in her shoulders and back; and shooting pain and numbness in her legs.  Id. at 1317.  Further, application of an Automated Impairment Rating System yielded that 44% of Claimant's body was impaired, broken down into the following impairments: lumbosacral region (4%); cervical region (4%); spine (8%); right ankle (21%); right knee (31%); right hip (25%); right leg (59%); left arm (7%); right wrist (4%); right elbow (12%); right shoulder (9%); and right arm (29%).  Id. at 1318–22.  Finally, a computerized muscle strength test showed motor deficits in Claimant's right elbow, righthand fingers, righthand wrist, right hip, right ankle, and left shoulder; and range of motion testing showed limitations in the cervical, lumbar, shoulder, and hip areas.  Id. at 1330–32.

### 9) Carl C. Eirle, M.D. ("Dr. Eirle")

On August 18, 2021, Claimant presented for an X-ray of her hips and pelvis that was interpreted by Dr. Eirle.  Id. at 1286–87.  Dr. Eirle found: no evidence of fracture; severe degenerative arthrosis with findings suggestive of possible osteonecrosis and collapse; significant evidence of bilateral hip heterotopic ossification; and normal morphology of the femoral head and acetabulum.  Id.  Dr. Eirle's impression was unilateral primary osteoarthritis in both of Claimant's hips.  Id.

Claimant also reported to Dr. Eirle that she first developed her hip pain in her early 20s when she had complications during pregnancy that resulted in her being in a coma for one month. Id. at 1288.  After this occurred, she developed significant heterotopic ossification in both of her hips, with her right hip worse than her left hip.  Id.  She underwent heterotopic ossification debridement in 1995 and 2006 and saw several orthopedic surgeons and rheumatologists, although her rheumatoid factor was negative.  Id.  Claimant was also ANA positive, although the implications of this were undetermined.  Id.  Dr. Eirle noted the possibility that Claimant had osteonecrosis due to receiving multiple steroids during her coma; and that Claimant walked with a severe antalgic gait.  Id.  Claimant had a significant and prolonged period of rehabilitation after her second hip surgery that impacted her current desire to proceed with treatment.  Id.

Claimant described her pain as aching, dull, throbbing, and constant and rated it at 7 out of 10.  Id.  Claimant stated that she felt pain while active, at rest, and during both the nighttime and the daytime and that the pain was exacerbated by standing, sitting, walking, and exercise.  Id.  She reported associated symptoms of numbness, tingling, and weakness; and confirmed that the pain improved with rest and medication.  Id.  Claimant further reported a history of fatigue and shortness of breath.  Id. at 1289.

A general examination indicated that Claimant was adequately groomed and oriented and that she had good coordination.  Id.  A physical examination of Claimant's hips demonstrated no deformities; normal standing alignment; antalgic gait; global tenderness to palpation; and a large posterior approach incision on the right hip that had healed well.  Id. at 1289–90.  That day, Claimant used an assistive device.  Id.  Her range of motion in both hips was as follows: flexion was 110 degrees or greater; extension was 20 degrees or greater; abduction was 20 degrees or greater; adduction was 15 degrees or greater; external rotation was 15 degrees or greater; flexion and internal rotation was normal; flexion and external rotation was normal; and arcs of motion were symmetric to the contralateral hip.  Id.  Moreover, Claimant's motor strength of the hip girdles and hip flexion was normal and 5 out of 5.  Id.

Dr. Eirle discussed treatment options with Claimant, which included temporizing intra-articular cortisone injections.  Id. at 1290.  Dr. Eirle also indicated that Claimant would require definitive total hip replacement for bilateral hips.  Id.  Claimant stated that she was unsure how she would like to proceed.  Id. at 1291.  In the meantime, Dr. Eirle prescribed analgesic medication to Claimant and encouraged her to exercise.  Id.

On October 11, 2021, Claimant presented for a follow up appointment with Dr. Eirle for her bilateral hip osteoarthritis.  Id. at 1361.  Claimant had received bilateral hip intra-articular injections six weeks prior and reported a 60% improvement in the left hip, with which she was satisfied.  Id.  However, Claimant had only obtained a 40% improvement in her right hip that had lasted approximately three weeks, with the pain having since returned.  Id.  Dr. Eirle noted that Claimant had arthroplasty level symptoms.  Id.  Claimant did not wish to proceed with surgery due to numerous social and financial factors.  Id.  She described her pain as aching, sharp, and intermittent and rated it at 6 out of 10.  Id.  The pain was present while Claimant was active during

the day and was exacerbated by standing, walking, and exercise.  Id.  She confirmed that she was taking pain medication.  Id.

A physical examination of Claimant's hips demonstrated no deformities; normal standing alignment; antalgic gait; and anterior and lateral tenderness to palpation.  Id. at 1362–63.  Claimant did not use an assistive device.  Id.  Her range of motion in both hips was as follows: flexion was 110 degrees or greater; extension was 20 degrees or greater; abduction was 20 degrees or greater; adduction was 15 degrees or greater; external rotation was 15 degrees or greater; flexion and internal rotation was normal; flexion and external rotation was normal; and arcs of motion were symmetric to the contralateral hip.  Id.  Claimant's motor strength of the hip girdles and hip flexion was normal and 5 out of 5.  Id.  Dr. Eirle recommended that Claimant undergo a right total hip arthroplasty and encouraged Claimant to exercise.  Id. at 1363.

### 10) Adam Nassery, M.D. ("Dr. Nassery")

On September 23, 2021, Dr. Nassery completed several medical statements regarding Claimant's pain.  Id. at 1351–54.  Regarding Claimant's low back pain, Dr. Nassery stated that the following symptoms were present during Claimant's examination or testing: limitation of motion of the spine, motor loss, and the need to change position more than once every two hours.  Id. at 1351.  Dr. Nassery opined that Claimant suffered from severe pain; could stand and sit for 30 minutes at one time, work for 2 hours per day, lift 5 to 10 pounds on an occasional basis, lift 5 pounds on a frequent basis, and bend and stoop occasionally.  Id.  Relying on the results of Dr. Rivas' functional assessment, Dr. Nassery also found that Claimant's lumbosacral region was 4% impaired and that her right lower extremity was 59% impaired.  Id.  Regarding Claimant's cervical spine disorder, Dr. Nassery stated that Claimant could rotate her neck to the right and to the left and could elevate her chin and bring her chin to her neck.  Id. at 1352.  Dr. Nassery reiterated that

Claimant's cervical region was 4% impaired, her right arm was 29% impaired, and her left arm was 7% impaired.  Id.

Dr. Nassery also stated that Claimant's left shoulder had limitation of motion, pain, bursitis, tendon erosion, a rotator cuff tear, AC joint arthritis, and glenohumeral joint arthritis; and that her right shoulder had limitation of motion, weakness, pain, and neurologic changes.  Id. at 1353.  Dr. Nassery opined that Claimant had the following limitations and abilities: she could work for 2 hours per day, stand for 30 minutes at a time and for a total of 60 minutes in a workday; sit for 30 minutes at a time and for a total of 60 minutes in a workday; lift 10 pounds occasionally; and lift 5 pounds frequently.  Id.  Dr. Nassery opined that Claimant could occasionally use her arms below shoulder level and occasionally raise them above shoulder level.  Id. at 1354.

11) **Diagnostic Medical Imaging of Pembroke Pines, LLC ("Diagnostic Medical Imaging")**

On September 27, 2021, Claimant presented for an MRI of her right hip at Diagnostic Medical Imaging.  Id. at 1358.  The MRI revealed normal marrow signal in the right femur and pelvic bones and no occult fractures; no significant joint effusion in the right or left hip; an intact gluteus minimus; a completely torn and retracted gluteus medius with mild muscular atrophy; fluid collection extending from the posterior superior facet; moderate to severe osteoarthritis of the hip joint with prominent spurring at the superior lateral acetabular margin and lateral and medial femoral head; subcortical cyst formation at the anterior lateral acetabulum and femoral head; and no mass or free fluid in the pelvis.  Id.

B.  **Non-treating Sources**

1)  **State Agency Doctor Frank Walker, M.D. ("Dr. Walker")**

On August 4, 2020, Dr. Walker completed a medical evaluation of Claimant.  Id. at 179, 190.  Dr. Walker found that Claimant had the medically determinable impairments of major joint

dysfunction and a spine disorder, which resulted in pain.  Id. at 179–80, 191.  Dr. Walker opined

that Claimant's medically determinable impairments could reasonably be expected to produce

Claimant's pain or other symptoms and that Claimant's statements about the intensity, persistence,

and functionally limiting effects of her symptoms were substantiated by the objective medical

evidence alone.  Id. at 180, 191.  Dr. Walker further opined that Claimant had the following

exertional limitations: she could occasionally lift and/or carry 20 pounds; frequently lift and/or

carry 10 pounds; stand and/or walk for a total of 6 hours in an 8-hour workday; sit for a total of 6

hours in an 8-hour workday; and push and/or pull for an unlimited time, other than what was shown

for her lifting and/or carrying limitations.  Id. at 180–81, 191–92.  According to Dr. Walker,

Claimant had the following postural limitations: she could climb ramps/stairs, stoop, kneel, crouch,

and crawl frequently; climb ladders/ropes/scaffolds occasionally; balance for an unlimited time;

and a limited ability to reach in any direction, especially with her left arm in front, laterally, and

overhead.  Id. at 181, 192.  Claimant did not have any visual or communicative limitations but did

have the environmental limitation of needing to avoid concentrated exposure to hazards such as

machinery and heights.  Id. at 181–82, 192–93.

Dr. Walker also completed an assessment of Claimant's ability to perform past relevant

work.  Id. at 183, 194.  He found that Claimant was not limited to unskilled work because of her

impairments and that she demonstrated the maximum sustained work capability for light work.  Id.

Accordingly, Dr. Walker found that Claimant was not disabled.  Id. at 184, 195.

### 2)  State Agency Doctor Roland Gutierrez, M.D. ("Dr. Gutierrez")

On March 19, 2021, Dr. Gutierrez completed a medical evaluation of Claimant at the

reconsideration level given her claim that, since the last evaluation, her medical condition had

deteriorated.  Id. at 198–99, 218.  Claimant alleged that she had undergone rotator cuff surgery in

August and that her pain was non-stop; and that she had developed fluid in her knees.  Id.  Dr. Gutierrez opined that Claimant was subject to the following exertional limitations: she could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of 6 hours in an 8-hour workday; sit for a total of 6 hours in an 8-hour workday; and push and/or pull for an unlimited time, other than what was shown for her lifting and/or carrying limitations.  Id. at 209, 228.  Claimant admitted that she could walk rapidly for one block without assistance and climb steps.  Id. at 210, 229.  Dr. Gutierrez also noted that Claimant did not have chest pain, leg pain, muscle weakness, fatigue, or lower back pain and had essentially normal strength, reflexes, and sensation notwithstanding her shoulder, spine, and hip issues.  Id.

Dr. Gutierrez reiterated the same manipulative and postural limitations as Dr. Walker and further opined that Claimant did not have any environmental limitations.  Id. at 210–12, 229–31. Dr. Gutierrez opined that Claimant's symptoms and functional limitations could be attributed to her medically determinable impairments; however, the stated degree and severity was not entirely supported and consistent with the medical evidence and other evidence in the record.  Id. at 212. 231.  Accordingly, Dr. Gutierrez concluded that Claimant retained the ability to perform a light range of work as described by Dr. Walker, and found that she was not disabled.  Id. at 212, 215, 231, 234.

## HEARING TESTIMONY

A hearing was held on October 26, 2021, before ALJ Aranda, at which Claimant and VE Conway testified.  Id. at 130–73.

### I.      Claimant

Claimant testified that she was born on May 20, 1973; that she was married; and that she had older children.  Id. at 137–38.  She testified that she had never learned how to drive; that she

had attended vocational school; and that she had obtained a medical billing and coding certificate that had since expired.  Id. at 138.  Claimant testified that she had last worked in December 2019 as a medical records coordinator, which had involved data entry, filing and retrieving patients' charts, answering phones, assisting doctors, patients, and staff, and lifting and carrying no more than 10 pounds.  Id. at 138–39.  Claimant stated that she had worked as a medical records coordinator for 14 years and that, prior to this employment, she had worked in a substantially similar capacity both at the University of Miami's X-ray department and in a doctor's office.  Id. at 139–40.  Claimant's role at the University of Miami involved filing and retrieving X-ray films, data entry, answering phones, assisting doctors and staff, and lifting approximately 15 pounds.  Id. at 140.  Claimant's role in the doctor's office involved data entry, assisting doctors, and filing and retrieving charts.  Id. at 140.

Claimant testified that she was always in pain; could not stand for a long period of time; suffered from back pain, neck pain, and hip pain; had weakness in her lower back, shoulders, and legs; and could not sit for a long period of time.  Id. at 141.  She testified that she could not sit for any longer than two hours in an eight hour workday because she would begin to develop shoulder, back, and neck pain; she could not stand for more than 30 minutes because she would begin to have increased pain in her lower back, legs, and hip area; and she could not walk for any longer than one hour because of increased pain in her legs, hips, and lower back.  Id. at 142.  Claimant testified that she could lift and carry no more than 5 pounds; otherwise, she would experience increased pain in her lower back, shoulder, and neck.  Id.  She testified that if she began to experience pain while sitting, she would get up and walk around for four to five minutes, and then sit back down.  Id. at 143.  She further explained that in an average day, she woke up at 10 A.M. or later because she had difficulty sleeping at night; ate breakfast that was cooked by her husband

while she was seated at the table; took a shower; sat down and watched TV for no more than two hours; stood up, stretched, walked around for four to five minutes, and sat back down for two hours; went to the grocery store with her husband and sat in the car while waiting for him; and attended doctor's appointments.  Id. at 144–48.  She did not need assistance to use the bathroom.  Id. at 148.  Claimant testified that while at home, she did not do anything else apart from watch TV and occasionally use her cell phone to speak with family members.  Id. at 149.  Claimant specified that she spoke to people using speakerphone because she experienced bad neck and shoulder pain if she held her cell phone for a long period of time.  Id.

Claimant explained that she had an accident on February 22, 2020, when she slipped on some soda that had spilled on the floor outside of the elevator in her apartment building.  Id. at 150.  She explained that she had landed on her left side and injured her left shoulder, knee, neck, and lower back; and that this accident had exacerbated pre-existing left and right shoulder pains.  Id.  She testified that she had filed a lawsuit as a result of her accident and that it was in the process of being litigated.  Id. at 151.  Claimant testified that she began to see Dr. Nassery and Dr. Eirle after her accident.  Id.

Claimant stated that she got around five hours of sleep every night and that she took medication to help her sleep through the night.  Id. at 153.  Claimant also testified that she sometimes cooked and washed the dishes but that she had to take long breaks in between because she could not stand for a long period of time due to her back and neck pain.  Id.  Claimant further testified that she resigned from her job in 2019 due to a 2018 work injury that eventually worsened.  Id. at 154.  With respect to her work injury, Claimant explained that a metal rod had fallen onto her right shoulder and that she had filed a worker's compensation claim.  Id.  Claimant explained that the claim had settled and that one of the settlement conditions had been that she resign from

her job.  Id.

Claimant testified that she was 5'3" tall and weighed 230 pounds.  Id. at 155.  She testified that she had first started going to Spine and Wellness Centers of America in August 2021 and that she had undergone surgery on her left shoulder in August 2020, after which, she did physical therapy.  Id. at 156.  However, Claimant stated that her pain was the same despite the physical therapy and that she had difficulty lifting anything over 5 pounds.  Id. at 157.  She described sharp pains, tightness, and stiffness in her left shoulder; and tightness, sharp pains, and weakness in her right shoulder.  Id. at 157–58.  Claimant did not have any difficulty using her hands and explained that she could only lift her left arm halfway above her head and that when she lifted her right arm, she experienced increased pain.  Id. at 158.

When questioned by her attorney, Claimant rated the pain in her left shoulder at 6 out of 10 and at 7 or 8 out of 10 without medication.  Id. at 159.  She could only lift 5 pounds with her left arm and experienced sharp pains, stiffness, and weakness if she attempted to lift anything heavier or hold the object above her head.  Id.  Claimant also testified that she could not lift anything heavier than 5 pounds with her right arm and that, if she did, she experienced increased pain, sharpness, and weakness.  Id. at 160.  Further, Claimant testified that she could not turn her head to the sides or look up or down and that, if she attempted to, she experienced sharp pains and weakness in her neck.  Id. at 160–61.  Specifically, Claimant explained that she would not be able to lower her head to look down at a keyboard; and that, as a result of her cervicalgia, the pain in her neck radiated all the way to her wrists, resulting in tingling and numbness.  Id. at 162.  With regard to her low back, Claimant explained that she felt tightness, like a muscle spasm, pain, and weakness; and, with regard to her hips, Claimant confirmed that she had arthritis, resulting in weakness and pain in both hips, and that doctors had recommended that she get a bilateral hip

replacement but that she had yet to undergo it due to financial constraints. Id. at 162–63.  Claimant

stated that she was always in pain.  Id. at 163.

## II.      VE Conway

VE Conway classified Claimant's prior work as follows:

➢ Medical records clerk, DOT #245.362-010, with an exertional level of light,[7] and a Specific Vocational Preparation (hereafter, "SVP") of 4.[8]

Id. at 164.

ALJ Aranda posed to VE Conway three hypotheticals for an individual of Claimant's age,

with her education and work experience who:

➢ was limited to the light exertional level and could not climb ladders, ropes, or scaffolds; could occasionally climb ramps and stairs; could occasionally stoop and balance, as defined by the Selected Characteristics of Occupations ("SCO"); could frequently reach in all directions with the bilateral upper extremities; could occasionally kneel, crouch, and crawl; and must avoid concentrated exposure to extreme cold, vibrations, and hazards.  (Hypothetical No. 1).

➢ was limited to the sedentary exertional level and had the same additional limitations as the individual in Hypothetical No. 1.[9]  (Hypothetical No. 2).

➢ was limited to either the light or the sedentary exertional level with the same

---

[7] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. §§ 404.1567(b) and 416.967(b).

[8] SVP is defined in the DOT as "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation."  See Dictionary of Occupational Titles app. c (4th ed., rev. 1991), http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC.HTM.
An SVP of 4 means that preparation for the job should take "[o]ver 3 months up to and including 6 months." Id.

[9] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. §§ 404.1567(a) and 416.967(a).

additional limitations as the individual in Hypothetical No. 1, except that the individual was further limited to occasional reaching in all directions with the bilateral upper extremities. (Hypothetical No. 3).

Id. at 164–66.

VE Conway testified that the individual in Hypothetical No. 1 would be able to perform Claimant's past work.  Id. at 165.  However, VE Conway testified that the individual in Hypothetical No. 2 would be unable to perform Claimant's past work but would be able to perform the following jobs:

> ➢ Document preparer, DOT #249.587-018, with an exertional level of sedentary, an SVP of 2,[10] and 15,000 jobs in the national economy.

> ➢ Call-out operator, DOT #237.367-014, with an exertional level of sedentary, an SVP of 2, and 8,500 jobs in the national economy.

> ➢ PC board assembly inspector, DOT #726.684-110, with an exertional level of sedentary, an SVP of 2, and 9,500 jobs in the national economy.

Id. at 166.  VE Conway also testified that the individual in Hypothetical No. 3 would be unable to perform Claimant's past work and, of the other jobs he identified, she could only perform that of a call-out operator.  Id. at 166–67.  Finally, VE Conway testified that an individual who was off task for 15% of the day or more would be unable to perform the jobs that he identified.  Id. at 167.[11]

Claimant's counsel posed three hypotheticals to VE Conway for an individual who:

> ➢ was limited of motion in her spine; needed to change position more than once every two hours and was in severe pain all the time; and could only sit and stand for 30 minutes, lift occasionally 10 pounds, lift frequently 5 pounds, occasionally bend, and occasionally stoop for a maximum of two hours in an eight hour work day, combined.

---

[10] An SVP of 2 means that preparation for the job should take "[a]nything beyond short demonstration up to and including 1 month."  See Dictionary of Occupational Titles app. c (4th ed., rev. 1991), http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC.HTM.

[11] However, VE Conway further testified that an individual who was limited to occasional overhead bilateral lifting and frequent reaching in all other directions, as well as an individual who was limited to no overhead reaching and frequent reaching in all other directions, would be able to perform the jobs that he identified. TR. at 170.

> ➤ had the same limitations as the individual in the first hypothetical but could rotate her neck to the left or right.

> ➤ was limited of motion in both shoulders; had weakness in the right shoulder, pain in both shoulders, bursitis in the left shoulder, tendon erosion in the left shoulder, a rotator cuff tear in the left shoulder, joint arthritis in the left shoulder, and humeral arthritis in the left shoulder; and could only sit for 30 minutes, stand for 60 minutes, lift 5 pounds frequently, lift 10 pounds occasionally, and lift each arm above and below shoulder level occasionally for a maximum of two hours in an eight hour work day, combined.

Id. at 168–69.  VE Conway testified that the limitations in each of these hypotheticals would preclude work in this economy.  Id.

## STANDARD OF REVIEW

A federal court's "review of a social security case is demarcated by a deferential reconsideration of the findings of fact and exacting examination of the conclusions of law." Williams v. Astrue, 416 F. App'x 861, 862 (11th Cir. 2011).  Thus,

> [t]he Commissioner's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla—i.e., the evidence must do more than merely create a suspicion of the existence of a fact and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.

Kieser v. Barnhart, 222 F. Supp. 2d 1298, 1305 (M.D. Fla. 2002) (citations omitted).  However, the Commissioner's "conclusions of law, including applicable review standards, are not presumed valid."  Williams, 416 F. App'x at 862.

## REGULATORY FRAMEWORK:  THE FIVE-STEP SEQUENTIAL PROCESS

The Social Security Regulations outline a five-step "sequential" evaluation process used to determine whether a claimant is disabled.

First, the ALJ must determine whether a claimant is engaged in "substantial gainful

activity" (hereafter, "SGA").  If the ALJ finds that the claimant is engaging in SGA, then the ALJ must find that the claimant is not disabled.  Phillips v. Barnhart, 357 F.3d 1232, 1237 (11th Cir. 2004).  In this case, ALJ Aranda determined that Claimant had not engaged in SGA since December 13, 2019, the alleged onset date.  TR. 109.

At the second step, the ALJ must determine if a claimant's impairments are "medically severe."  If the ALJ determines that the claimant's impairments are medically severe, then he or she must proceed to the third step.  Phillips, 357 F.3d at 1237.  In this case, ALJ Aranda found that Claimant suffered from the following severe impairments: osteoarthritis of bilateral hips, inflammatory polyarthropathy, degenerative joint disease of bilateral shoulders, degenerative disc disease of the spine, and obesity.  TR. 110.  ALJ Aranda then proceeded to step three.

At step three, the ALJ must determine if a claimant's impairment(s) "meet or equal" any of the listed impairments in the regulations.  Phillips, 357 F.3d at 1238.  If so, the ALJ must find the claimant disabled; if not, then the ALJ should proceed to step four.  Id.  Here, ALJ Aranda determined that Claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.  TR. at 110.  Therefore, ALJ Aranda proceeded to step four.

Step four is a two-pronged process, which first requires the determination of a claimant's RFC and then, based on that RFC, a determination of whether the claimant can return to any "past relevant work."  Phillips, 357 F.3d at 1238.  As to the first prong, ALJ Aranda determined that Claimant had the RFC to:

> perform sedentary work as defined in 20 C.F.R. 404.1567(a) and 416.967(a) except Claimant could not climb ladders, ropes, and scaffolds; could occasionally climb ramps and stairs; could occasionally stoop and balance as defined by the SCO; could frequently reach in all directions with the bilateral upper extremities, except she could not reach overhead with the bilateral upper extremities; could occasionally kneel, crouch, and crawl; and must avoid concentrated exposure to

extreme cold, vibrations, and hazards.

TR. 111.  Based on Claimant's RFC, ALJ Aranda moved to prong two of step four and concluded that Claimant was not able to perform past relevant work as a medical records clerk.  Id. at 115. ALJ Aranda then proceeded to the fifth and final step.

Step five requires the ALJ to determine whether the claimant is able to do any work considering the claimant's age, education, work experience, and RFC.  Phillips, 357 F.3d at 1239– 40.  ALJ Aranda determined that, given Claimant's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy which Claimant could perform.  TR. at 116–17.

Therefore, ALJ Aranda concluded that Claimant was not under a disability, as defined in the Social Security Act, from December 13, 2019, through the date of the Unfavorable Decision. Id. at 117.

## **DISCUSSION**

As noted above, Claimant argues that:

I.      The Appeals Council abused its discretion in declining to admit "new and material" evidence showing Claimant underwent a total right hip replacement just 34 days after the ALJ's decision was issued; and

II.     The ALJ failed to properly assess the opinion evidence of record and, consequently, the ALJ's RFC finding was also not supported by substantial evidence.

See Claimant's Motion for Summary Judgment [D.E. 13].  The undersigned finds no merit in either of these contentions.

**I.      Whether the Appeals Council abused its discretion in declining to admit "new and material" evidence showing Claimant underwent a total right hip replacement just 34 days after the ALJ's decision was issued.**

Claimant first contends that the Appeals Council erred in declining to consider records that she submitted after ALJ Aranda issued her decision.  These records are from the Orthopaedic

Center of South Florida and Spine and Wellness Centers of America and document Claimant's right hip replacement surgery as well as her post-surgery symptomatology. Claimant argues that these records are "new, material, chronologically relevant, and the opinions [and] findings therein are contrary to the weight of the ALJ's actions, findings, and conclusions, warranting remand for further consideration of the evidence." See Claimant's Motion for Summary Judgment [D.E. 13 at 6].

"When a claimant submits new evidence to the Appeals Council, '[t]he [Council] must consider new, material, and chronologically relevant evidence and must then review the case if the ALJ's decision is contrary to the weight of the evidence currently of record.'" Burnett v. Comm'r of Soc. Sec. Admin., No. 20-CV-81211, 2021 WL 4973594, at *3 (S.D. Fla. Aug. 24, 2021) (alterations in original) (citing Levie v. Comm'r of Soc. Sec., 514 F. App'x 829, 832 (11th Cir. 2013); 20 C.F.R. §§ 404.970(b), 416.1470(b)). "Evidence is new if it is non-cumulative to the evidence submitted to the ALJ[,] . . . chronologically relevant if it relates to the period on or before the date of the [] hearing decision[,] . . . [and] material if there is a reasonable possibility that the new evidence would change the administrative result." Burnett, 2021 WL 4973594, at *3 (quotation marks and citations omitted). "There is no requirement that the Appeals Council 'provide a detailed discussion of a claimant's new evidence when denying a request for review.'" Edmondson v. Saul, No. 20-14211-CIV, 2021 WL 3727871, at *2 (S.D. Fla. July 29, 2021) (citing Mitchell v. Comm'r, Soc. Sec. Admin., 771 F.3d 780, 784 (11th Cir. 2014)). The role of the Court is limited to "consider[ing] whether the new evidence makes the ALJ's decision to deny benefits erroneous." Id. (citing Ingram v. Comm'r of Soc. Sec. Admin., 496 F.3d 1253, 1262 (11th Cir. 2007)).

The Appeals Council declined to consider Claimant's additional evidence from the

Orthopaedic Center of South Florida because "[it] does not relate to the period at issue." TR. at 2. These records are dated November 15, 2021, id. at 29–31, and December 14, 2021, id. at 48–65, 76–93, and document Claimant's decision to undergo right hip replacement surgery. Claimant argues that the November 15, 2021, treatment note is chronologically relevant because it referenced Dr. Eirle's prior discussions with Claimant about pursuing a hip replacement and noted that Claimant's symptoms had "only worsened" since her last visit, resulting in her decision to undergo surgery as documented in the December 14, 2021, hospital admission notes. See Claimant's Motion for Summary Judgment [D.E. 13 at 5–6]. However, "[e]vidence that a condition the ALJ previously considered has deteriorated may entitle a claimant to benefits under a new application, but it is not probative of whether a person is disabled during the specific period under review." Bostick o/b/o D.B. v. Comm'r of Soc. Sec., No. 8:19-cv-585-T-MAP, 2020 WL 2394153, at *3 (M.D. Fla. May 12, 2020) (citing Wilson v. Apfel, 179 F.3d 1276, 1279 (11th Cir. 1999); Griffin v. Comm'r of Soc. Sec., 723 F. App'x 855, 858 (11th Cir. 2018)).[12]  As noted by the Commissioner, "[d]eterioration of impairments after the ALJ's decision does not require remand; it requires a new application for benefits, as indicated by the [Appeals Council]." See Commissioner's Motion for Summary Judgment [D.E. 20 at 19] (citing Stone v. Comm'r of Soc. Sec. Admin., 658 F. App'x 551, 555 (11th Cir. 2016)).  Therefore, the Appeals Council applied the correct standard in finding that these records were not chronologically relevant to the period at issue—December 13, 2019, through the date of ALJ Aranda's November 10, 2021, decision—and declining to consider them.

---

[12] Claimant argues that ALJ Aranda "never even acknowledge[d] [that Claimant] required any hip replacement at all", see Claimant's Motion for Summary Judgment [D.E. 13 at 7], but this assertion is not accurate.  In her decision, ALJ Aranda noted that some of Claimant's records "document an antalgic gait, pain with overhead activities, and *the need for hip surgery in the future*." TR. at 114 (emphasis added).  As a result, ALJ Aranda "incorporated reasonable exertional and nonexertional limitations in [her RFC assessment] that are consistent with the evidence of record and [Claimant's] allegations of disability." Id.

As for the additional evidence from Spine and Wellness Centers of America, the Appeals Council declined to consider it because it "does not show a reasonable probability that it would change the outcome of the decision." TR. at 2. This record, dated October 28, 2021, contains a treatment note from a follow up evaluation regarding Claimant's joint pain and fatigue. Id. at 35–36. The doctors noted, in part, that Claimant had shoulder, neck, lower back, and hip pain; that she was taking medication to help her sleep at night; that physical therapy had contributed to some improvement in her pain; that she had weakness in her shoulder and walked with an antalgic gait; that she was a candidate for a bilateral hip replacement; and that a physical examination of Claimant was within normal limits. Id. Per Claimant's own admission, this record "contains no new revelations per se, so it arguably could be construed as more of the same type of evidence [that] the ALJ had already purportedly considered." See Claimant's Motion for Summary Judgment [D.E. 13 at 6–7]. Indeed, ALJ Aranda considered a substantially similar treatment note from a prior evaluation on September 14, 2021, id. at 1348–49, wherein doctors noted that Claimant had a normal functional status in spite of her pain level. Thus, Claimant has failed to prove that there is a reasonable possibility that the October 28, 2021, treatment note would change ALJ Aranda's administrative result; and the Appeals Council again applied the correct standard in finding that it was not material, new evidence and declining to consider it.[13]

---

[13] Claimant also submitted additional evidence from Spine and Wellness Centers of America pertaining to a January 10, 2022, evaluation after her surgery, wherein Claimant disclosed, in part, that she continued to experience pain in her shoulders, back, and neck; that she had developed morning joint stiffness; and that her pain medication was causing an upset stomach. TR. at 38–39. However, Claimant does not explain how this post-surgery note would change ALJ Aranda's decision.

II.     **Whether the ALJ failed to properly assess the opinion evidence of record and, consequently, the ALJ's RFC finding was also not supported by substantial evidence.**

Claimant also contends that ALJ Aranda failed to properly assess the persuasiveness of Dr. Nassery's medical opinion, see TR. at 1351–54, thereby failing to support her RFC finding with substantial evidence.   Specifically, Claimant argues that ALJ Aranda failed to evaluate the supportability and consistency of Dr. Nassery's medical opinion with the evidence of record, thereby warranting remand.

20 C.F.R. § 404.1520c(b) provides that the Commissioner "will articulate in [the] determination or decision how persuasive [he or she] finds all of the medical opinions and all of the prior administrative medical findings in [the claimant's] case record."   For claims filed on or after March 27, 2017, an ALJ satisfies the articulation standard set forth in 20 C.F.R. § 404.1520c(b) by considering certain factors enumerated in 20 C.F.R. § 404.1520c(c)(1)–(5).   "The most important factors [the Commissioner] consider[s] when [] evaluat[ing] the persuasiveness of medical opinions and prior administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section)."   20 C.F.R. § 404.1520c(a).   With regards to the factor of supportability, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be."   Id. § 404.1520c(c)(1).   With regard to the factor of consistency, "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."   Id. § 404.1520c(c)(2).   The same regulation provides that the Commissioner will "not defer or give any

specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." Id. § 404.1520c(a).  Finally, "when a medical source provides multiple medical opinion(s) . . . [the Commissioner] will articulate how [he or she] considered the medical opinions . . . from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section." Id. § 404.1520c(b)(1).

Claimant argues that, "with respect to the 'supportability' factor, the ALJ relie[d] nearly exclusively on a multitude of benign clinical findings to discredit Dr. Nassery" when "there [were] a multitude of examples of clinically significant findings on examination that the ALJ altogether appear[ed] to have avoided". See Claimant's Motion for Summary Judgment [D.E. 13 at 12]. Claimant then lists medical evidence in support of her claim that she is disabled, including records and contemporaneous procedural findings documenting Claimant's symptoms, pain, and treatment for the periods of April and August 2019; February through November 2020; and March, April, August, September, and October 2021. Id. at 12–24.  However, contrary to Claimant's contention that ALJ Aranda avoided these records, the ALJ actually detailed the majority of them in her decision. See TR. at 112–13 (recounting Claimant's MRI results from April and August 2019 and her injuries and treatment for the same throughout 2020 and 2021).  ALJ Aranda then evaluated the supportability of Dr. Nassery's opinion against the backdrop of this evidence and concluded that it was unsupported given that the record ultimately showed that: "the [C]laimant remained neurologically intact[;] [a]lthough during some visits [she] exhibited an antalgic gait, during other visits, her gait was normal[;] she did not require an assistive device[;] [t]here were no sensory deficits[;] [s]he exhibited generally normal strength[;] [and] physical examinations showed normal straight leg raise testing". Id. at 114.  To the extent that Claimant argues that other portions of

these records could support a different finding about Claimant's health, "that is not for us to decide because so long as the 'Commissioner's decision is supported by substantial evidence, this Court must affirm, even if the proof preponderates against it.'" Bonilla v. Saul, No. 19-25323-Civ, 2020 WL 9048787, at *5 (S.D. Fla. Oct. 23, 2020), report and recommendation adopted, 2021 WL 1198296 (S.D. Fla. Mar. 30, 2021) (quoting Phillips, 357 F.3d at 1240 n.8).

Claimant further argues that ALJ Aranda wholly failed to evaluate the consistency of Dr. Nassery's medical opinion with the evidence of record. See Claimant's Motion for Summary Judgment [D.E. 13 at 25]. However, ALJ Aranda did discuss the consistency factor when she addressed Dr. Rivas' functional evaluation in the following paragraph. See TR. at 114. This was appropriate given that Dr. Nassery referred Claimant to the functional evaluation conducted by Dr. Rivas and incorporated several results from the evaluation in his own opinion, including that: Claimant's lumbosacral region was 4% impaired and her right lower extremity was 59% impaired; Claimant could rotate her neck to the right and to the left and could elevate her chin and bring her chin to her neck; and Claimant's cervical region was 4% impaired, her right arm was 29% impaired, and her left arm was 7% impaired. Id. at 1351–52. ALJ Aranda concluded that these opinions were inconsistent with evidence of Claimant's neurological intactness and generally normal strength. Id. at 114–15. ALJ Aranda further wrote that "the functional evaluation [was] not a valid representation of [C]laimant's disability" as it reflected "no methodology" and contained "many values that were not measured or invalid." Id. at 114. Given this analysis, ALJ Aranda properly found that the results of the functional evaluation, as incorporated in Dr. Nassery's medical opinion, were inconsistent with the evidence of record and, thus, not persuasive.

Accordingly, ALJ Aranda did not err in her assessment of the persuasiveness of Dr. Nassery's medical opinion.

## <u>**RECOMMENDATION**</u>

Based on the foregoing considerations, the undersigned RESPECTFULLY RECOMMENDS that Claimant's Motion for Summary Judgment [D.E. 13] be DENIED, the Commissioner's Motion for Summary Judgment [D.E. 20] be GRANTED, and the Commissioner's decision be AFFIRMED.

Pursuant to Local Magistrate Judge Rule 4(b), the parties have **<u>fourteen days</u>** from the date of this Report and Recommendation to file written objections, if any, with the Honorable Beth Bloom, United States District Judge.  Failure to file timely objections may bar the parties from attacking the factual findings contained herein on appeal.  <u>See</u> <u>Resolution Tr. Corp. v. Hallmark Builders, Inc.</u>, 996 F.2d 1144, 1149 (11th Cir. 1993).  Further, "failure to object in accordance with the provisions of [28 U.S.C.] § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions."  <u>See</u> 11th Cir. R. 3-1 (I.O.P. - 3).

RESPECTFULLY SUBMITTED in Chambers at Miami, Florida, this <u>6th</u> day of January, 2023.

_____
ALICIA M. OTAZO-REYES
UNITED STATES MAGISTRATE JUDGE


cc:    United States District Judge Beth Bloom
       Counsel of Record